Filed 10/21/15  P. v. Ruelas CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>JACOBO RUELAS, JR.,<br><br>　　　Defendant and Appellant. | H040372<br>(Monterey County<br>Super. Ct. No. SS062555) |

### STATEMENT OF THE CASE

A jury convicted defendant Jacobo Ruelas, Jr. of first degree murder (Pen. Code, §§ 187/189), kidnapping during a carjacking (Pen. Code, § 209.5), and kidnapping to commit robbery (Pen. Code, § 209, subd. (b)).  The jury found true the special circumstances of murder while engaged in the commission of robbery (Pen. Code, § 190.2, subd. (17)(A)), kidnapping to commit robbery (Pen. Code, § 190.2, subd. (17)(B)), kidnapping to commit carjacking (Pen. Code, § 190.2, subd. (17)(B)), and carjacking (Pen. Code, § 190.2, subd. (17)(L)).  The jury also found true allegations that defendant personally used a knife (Pen. Code, § 12022, subds. (b)(1) & (b)(2)).  The trial court sentenced defendant to life in prison without the possibility of parole, plus one year.

Defendant now appeals from judgment of conviction.  On appeal, defendant makes the following arguments:  1) the trial court erred in denying his *Faretta*[1] motion for self-representation; 2) defense counsel rendered ineffective assistance in failing to object to evidence of defendant's gang membership and in failing to cross-examine two prosecution witnesses regarding a recorded jail conversation; 3) the trial court prejudicially erred in admitting hearsay statements; 4) the trial court erred in failing to sua sponte instruct the jury that two witnesses were accomplices as a matter of law; 5) the trial court erred in denying two defense motions for continuances; and 6) cumulative error warrants reversal.

As set forth below, defendant's arguments are unpersuasive.  We will affirm the judgment of conviction.

STATEMENT OF THE FACTS

*The Killing and the Investigation*

On the night of September 18, 1997, 17-year-old Kristopher Olinger went to the beach in Pacific Grove in order to take photographs of a lighthouse.  Olinger drove to the beach in his Honda.  Olinger was wearing a gold ring and a watch that night, and he brought his camera and his wallet with him.

Around 6:00 a.m. on September 19, 1997, a jogger discovered Olinger's dead body on the beachfront.  There were stab wounds on Olinger's chest, neck, chin, shoulder, leg, and abdomen.  An autopsy revealed that Olinger died as a result of multiple stab wounds to his torso.

On September 30, 1997, police found Olinger's Honda parked in front of a San Jose house.  In October 1997, police recovered latent fingerprints and palm prints from Olinger's Honda.

---

[1] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

2

Olinger's ring, watch, wallet, and camera were missing. The items were not present when his body was discovered, and the items were not in his Honda.

The case remained unsolved for several years. In 2004, prints recovered from Olinger's Honda were processed in a new automated print system. Police learned that defendant's palm print was on the exterior of the Honda's driver's door window. Defendant's fingerprint was on the Honda's front passenger seatbelt. Fingerprints belonging to defendant's brother, Angel Ruelas,[2] were on the Honda's interior driver's door handle, the Honda's steering wheel, and zigzag papers found inside the Honda.

After defendant's prints were identified, police began to interview people who knew defendant. At trial, several witnesses were identified by number in order to protect their identities.

***Witness 194's Testimony***

Witness 194, defendant, Angel, and witness 188 all "grew up together" in Soledad. On September 18, 1997, defendant, Angel, witness 194, and witness 188 went for a ride in witness 188's car. Witness 188 was the driver. They drove from witness 188's Soledad home to Salinas, and they spent a "short time" in Salinas. After they left Salinas, they drove toward Monterey. They ended up at Lover's Point in Pacific Grove.

When they arrived at Lover's Point, Olinger's Honda was parked in a parking lot. Witness 188 parked his car in the parking lot. Defendant and Angel stepped out of witness 188's car and walked toward Olinger's Honda. Witness 194 testified that defendant and Angel "carjacked" Olinger. Witness 194 explained that Olinger was sleeping in the driver's seat of his Honda, defendant "took" Olinger into the Honda's backseat, and Angel drove the Honda to a turnout a "couple miles" away. Witness 188 and witness 194 remained in witness 188's car and followed the Honda to the turnout.

---

[2] Defendant and Angel Ruelas share the same surname. In order to avoid confusion, this opinion will refer to Angel Ruelas as "Angel."

When the Honda parked at the turnout, defendant and Angel dragged Olinger out of the Honda. Olinger was on the ground, and defendant stabbed Olinger "everywhere." While defendant stabbed Olinger, Angel hit and kicked Olinger. Defendant handed the knife to Angel, and Angel stabbed Olinger. Defendant and Angel then threw Olinger over a cliff.

Defendant walked toward witness 188's car, put his arm through the window, and tried to give the knife to witness 188 and witness 194. Witness 188 and witness 194 refused to take the knife, and defendant told them they were "pussies." Angel said to witness 194, "We killed him."

Defendant and Angel drove away in Olinger's Honda. Witness 188 and witness 194 drove back to Soledad in witness 188's car. Witness 194 did not report the stabbing to the police because he feared he would be killed if he did so.

On September 19, 1997, witness 194 saw Angel at a Soledad park. Angel was standing next to Olinger's Honda and was "trying to sell stuff." Witness 194 testified that Angel was trying to sell a camera and a ring. Witness 194 touched the Honda while it was parked at the park, and police found his palm print on the exterior of one of the doors.

Witness 194 spoke to defendant on September 19, 1997. Defendant told witness 194 "never to mention" the stabbing and carjacking. Witness 194 understood defendant's comment as "a warning." Witness 194 explained that "if you're a snitch" in Soledad, you are "pretty much dead."

Witness 194 received immunity from prosecution in exchange for truthful testimony. Witness 194 was relocated through the witness relocation program. He agreed to be relocated because he feared he would be unsafe if he stayed in Soledad. As part of the witness relocation program, witness 194 received money for food and rent.

4

On cross-examination, witness 194 admitted that there was "[p]robably" a conversation about "robbing somebody" during the car ride to Pacific Grove on the night of the stabbing. He also testified that "there was some discussion about finding someone to beat up." Witness 194 explained, however, that he had "nothing to say" and "had no say-so" in any conversation regarding a potential crime.

*Witness 188's Testimony*

Witness 188 testified that, on the night of charged crimes, he drove defendant, Angel, and witness 194 to Salinas in order to look for girls. They did not find any girls in Salinas, so they headed toward Monterey to look for girls.

Witness 188 eventually parked his car in a parking lot. Defendant and Angel got out of witness 188's car and "jumped in" Olinger's Honda. Witness 188 and witness 194 remained inside witness 188's car. Defendant and Angel drove away in Olinger's Honda. Witness 188 and witness 194 followed in witness 188's car. Witness 188 saw the Honda stop at a pullout near the ocean. Witness 188 stopped his car. Witness 188 saw defendant and Angel drag Olinger out of the Honda. Witness 188 testified that defendant or Angel made stabbing motions. He testified that he had "no idea" whether it was defendant or Angel who did the stabbing. Witness 188 admitted, however, that at the grand jury hearing he testified that defendant was the one who did the stabbing. He also admitted telling the police that defendant had done the stabbing.

Immediately after the stabbing, defendant tried to hand the knife to witness 194 and witness 188. They refused to take the knife. Defendant and Angel drove away in Olinger's Honda. Witness 188 and witness 194 drove back to Soledad in witness 188's car.

Witness 188 received immunity from prosecution in exchange for truthful testimony. Witness 188 did not want to testify against defendant. He feared that his testimony would jeopardize his family's safety and subject him to retaliation.

5

*Witness 191's Testimony*

Witness 191 was friends with defendant and Angel in 1997. In the early morning hours on September 19, 1997, defendant and Angel came to witness 191's Greenfield home. Witness 191 noticed that defendant and Angel looked nervous, jittery, and antsy. Defendant and Angel showed a Honda to witness 191. The Honda's interior "was sandy," and there was blood on the Honda's back seat. Defendant and Angel said that "they went to Monterey and took the guy's car." Defendant and Angel told witness 191 "about the stabbing," and they said the stabbing took place at the beach. Defendant and Angel showed witness 191 a camera and a wallet that they had stolen from Olinger. A school identification card bearing Olinger's picture was inside the wallet. There was a bloody T-shirt inside the Honda. Witness 191 helped defendant and Angel burn the bloody T-shirt. Witness 191 helped them because they were his friends and because defendant was "intimidating." When the sun came up, defendant and Angel drove away in the Honda.

*Witness 253's Testimony*

In 1997, witness 253 was witness 191's girlfriend. Witness 253 was present when defendant and Angel came to witness 191's house on September 19, 1997. Witness 253 noticed that defendant and Angel seemed jittery, and she explained that "obviously something had happened." She testified that she heard defendant and Angel say that "they had done something to somebody." At trial, witness 253 could not remember the exact words that were spoken by defendant and Angel. During a 2006 police interview, witness 253 told police that she heard defendant and Angel "whispering that they had stabbed somebody," and she also told police that defendant said he "stabbed a white boy."

Witness 253 testified that, when defendant and Angel came to witness 191's house on September 19, 1997, she saw an identification card bearing a picture of a white male

6

who looked like Olinger. Witness 253 also saw a car parked outside of witness 191's house. She was curious about the car because of "everything" defendant and Angel had said. When she was shown a picture of Olinger's Honda, witness 253 testified that she recognized the Honda because it looked like the car that was parked outside of witness 191's house. Witness 253 testified that there was a bag of clothes present when defendant and Angel were at witness 191's house, and she remembered telling police that "[t]he stuff in the bag was burned." She further testified that defendant and Angel gave Olinger's watch to witness 191.

Witness 253 was afraid to testify. She explained that she had heard "bad stories" about people who had given testimony.

### Witness 442's Testimony

In 1997, witness 442 was friends with defendant and Angel. Witness 442 described an occasion in September 1997 when Angel showed witness 442 a car and a gold ring. Angel said that he stole the ring. Angel explained that he "caught some white guy sleeping out there by Monterey and . . . took his stuff." Angel stated that he and defendant "murdered and carjacked some guy for his stuff," and he also stated that he and defendant "stabbed him and threw him off a cliff into the ocean." Angel said that witness 188 and witness 194 "were with him," but witness 188 and witness 194 "pussied out," "got scared," and "didn't want to . . . participate in it." Angel gave the ring to witness 442 so that witness 442 could "get rid of it." Angel drove away in the car.

Later that day, witness 442 and Angel watched television together. They watched a news report in which Olinger's father described his pride in his son for "put[ting] up a fight" before his death. Angel "cracked up" and said, "Hell, no. That dude didn't put up shit of a fight."

Witness 442 testified that Angel drove Olinger's car to a concert in San Jose. After that concert, witness 442 never saw the car again. Sometime after the concert,

7

witness 442 overheard defendant and Angel talking about "how they better have wiped" the car.

In 2005, witness 442 told police about defendant's and Angel's involvement in the charged crimes. Witness 442 went to the police to "trade information" and get medical care for his brother and help for a friend who had been arrested. A few weeks after he spoke with police, witness 442 was relocated through the witness relocation program. He received money for rent and food as part of the program. Witness 442 testified that his life was in danger due to his "snitching" and testimony against defendant.

### Testimony of Angel's Girlfriend

In 1997, Mayra Velarde was Angel's girlfriend. On September 20, 1997, she and Angel attended a concert in San Jose. Angel drove her to the concert in a car that she had never seen before. She and Angel drove home to Soledad in a different car.

### Defense Evidence

In 1997, Jolene Barba lived across the street from witness 442. She frequently spent time at witness 442's home. She did not remember a time when Angel came to witness 442's house and talked about stabbing someone and stealing a car. She did not remember a time when Angel showed off a gold ring that he had stolen. She testified that she would definitely remember a conversation about a stabbing if such a conversation had occurred. Barba's testimony contradicted the testimony of witness 442, who testified that Barba was "part of" the conversation in which Angel spoke about stabbing Olinger and stealing the ring.

**DISCUSSION**

## I. *Denial of Defendant's Motion for Self-Representation*

Defendant contends that the judgment must be reversed because the trial court erred in denying his *Faretta* motion for self-representation. Specifically, defendant asserts that the trial court erred in ruling that the motion was untimely and made for the

8

purpose of delay. As explained below, the trial court did not abuse its discretion in denying defendant's *Faretta* motion.

### A. *Background*

At a hearing on July 23, 2013, defendant told the trial court that he "would like to file a *Faretta* motion" for self-representation. The trial court asked defendant whether he would be ready for motions in limine, which were scheduled to be heard on August 23, 2013. Defendant responded that he would "have no choice but to be ready" and "would work to the best of [his] ability to have that filed in a timely manner." The trial court then asked defendant whether he would be ready for the jury trial, which was scheduled to begin on September 9, 2013. Defendant replied, "I'm ready to proceed forthwith, your Honor." The trial court sought clarification of defendant's responses, asking defendant whether he would seek a continuance beyond the scheduled dates. Defendant told the court that he would not request a continuance "[c]onsidering no unforeseen circumstances." The trial court commented that defendant seemed to be "hedging [his] bets."

The trial court then noted that defendant had previously been granted self-representation in the instant case, that defendant had stated that he would not require a continuance during that self-representation, and that defendant nonetheless asked for continuances. Defendant asked the trial court to "refresh [his] memory" regarding the previous grant of self-representation. The trial court explained: "On April 19, 2011, [a] *Faretta* motion was granted. You indicated you would be ready for trial. [¶] On August 9th, 2011, the trial was set for September 6th. You indicated you would be ready for trial, yet you asked for a continuance. A continuance was granted on August 9th, 2011. You said on the record that would be sufficient time and you would be ready for trial. [¶] Throughout every appearance I gave you a list of things to do to get ready for trial, provide witness lists, provide discovery, file jury instructions, file trial briefs regarding

9

stipulations. And every appearance you repeatedly failed to do anything I requested you to do, failed to meet each and every deadline. [¶] I repeatedly asked you again and again to . . . provide witness lists, provide discovery, file trial briefs, provide jury instructions and you failed to meet each and every one of the Court's requests. [¶] And you again asked to continue the trial. That was denied. Previously . . . you indicted that you wouldn't need advisory counsel, you then later filed a request for advisory counsel. That was denied. [¶] On the eve of trial you moved to withdraw your right to represent yourself. So we appointed counsel for you. Counsel came in, did all the work, and then, again, on the eve of trial, you again asked to represent yourself." The trial court expressed concern that, in light of defendant's previous self-representation, defendant's current *Faretta* motion was a "delaying tactic."

Defendant stated that he had requested continuances during his previous self-representation due to "restrictions that [he] was receiving through the jail." The trial court stated, "Those same difficulties will still exist if you represent yourself again; correct?" Defendant responded, "Honestly, your honor, I see your point." Defendant then explained that he felt like he was "being forced to take on an attorney," that he was not satisfied with the defense that counsel was going to present, and that he "always wanted to be in control of" his own case. The trial court asked defendant, "Then why did you withdraw your [previous] request to represent yourself if you wanted to represent yourself?" Defendant explained that, when he was representing himself, his phone calls with his investigator and his potential witnesses were "all being recorded." Defendant requested that, upon a new grant of self-representation, the trial court order a "confidential setting" for witness interviews.

The prosecutor responded to defendant's comments: "Everything the defendant has just finished saying to the court is exactly what he said the last time. And when I say, 'the last time,' I actually mean in April of 2011 when the *Faretta* motion was granted.

10

[¶] He was given that opportunity. And then, in August of 2011, he requested a continuance. Again, he brought another *Faretta* motion in March 2012, days before our next trial. [¶] Right now we're 33 court days from trial. The defendant is in the same situation in county jail that he was before. If he represents himself he's still not entitled to any special privileges. He still doesn't get access to what he wants. Because he's not entitled to it. The expectations on him are exactly the same as they were in 2011. He wasn't able to do it then and he used it as a delaying tactic to get a continuance, which he was successful at. [¶] And then days before the next trial date he tries it again. . . . [¶] . . . [¶] Now we're 33 days from trial and we're going through the same motions. [¶] It appears to be a delaying tactic on the defendant's part. The court recognized it as such back in April or March of last year. We ask that the Court recognize it today."

After the comments of defendant and the prosecutor, the trial court denied defendant's motion for self-representation. The first ground for the denial of the motion was that the motion was untimely. The second ground for the denial of the motion was the trial court's determination that defendant brought the motion for the purpose of delay.

The trial court made a lengthy record regarding the timeliness of defendant's *Faretta* request. The trial court explained that it had to "look at the totality of the circumstances in determining if the request is timely." The trial court then described many circumstances that demonstrated that defendant's request was untimely.

The first circumstance was that defense counsel had been representing defendant for 14 months, and yet defendant had "waited 14 months after appointment of [defense counsel] before making this request." The trial court expressed frustration with defendant's 14-month delay in bringing his *Faretta* motion: "It's not like the defendant didn't have the opportunity. This Court took the very unusual step in this case of meeting almost on a monthly basis, providing everyone opportunities to address all issues, yet the defendant waited until the eve of trial." The trial court then described the quality of

11

defense counsel's representation of defendant: "[T]he representation currently provided to the defendant is of the highest caliber of unquestioned expertise in the criminal area in high complex cases. So, clearly, the quality of representation of the defendant is of the highest caliber as shown by all the hearings." The trial court then noted that defense counsel was ready to proceed to trial, explaining: "As noted in every appearance, [defense counsel] has indicated what he needs to get done, what he's done, where he's going. And it is clear that [defense counsel] is ready to proceed to trial in this case. [¶] I do not anticipate a continuance . . . as to the way this case has been proceeding for the last 14 months with [defense counsel]." The trial court next described potential problems with witnesses, explaining that the crime occurred in 1997, the witnesses' memories had likely "dimmed," some witnesses were "no longer available," and some witnesses had been in the witness relocation program "for many years putting their lives on hold pending this trial." The trial court finally explained that the case was "rather complex considering scientific evidence, DNA evidence, accomplice issues, immunity issues, gang overtones, the age of the case, the number and nature of the witnesses, and the length of the trial." Given the foregoing circumstances, the trial court concluded that defendant's *Faretta* motion was untimely.

The trial court also described circumstances that showed that defendant had made his *Faretta* request for the purpose of delay. The trial court explained that, during the previous grant of self-representation, defendant engaged in dilatory behavior: "[T]he defendant has previously represented himself in this case. And it was clear based upon hearing date after hearing date, court order after court order, the Court's request for the defendant to comply with very simple things and be ready for trial that he failed to meet each and every single deadline I set. And I extended deadline after deadline. And it was never complied with. All we got was, 'I need more time.' Delays, delays, delays." The trial court then expressed doubt regarding defendant's stated reasons for seeking a new

12

grant of self-representation: "I do agree with [the prosecutor]. Nothing has changed. Absolutely nothing has changed except that, again, you've gotten close to trial. All your reasons to represent yourself, nothing has changed. All the reasons why you chose to withdraw your request to represent yourself have not changed at all." The trial court stated that defendant's claim that he would not seek to continue the trial was not credible: "[T]he Court does not find [defendant] credible in the slightest that he would not ask a for a further continuance or delay. [¶] I think a clear reading of his . . . words in court today . . . and body language . . . and the delays and pregnant pauses in responding to simple questions clearly shows that [defendant] is looking at ways to play semantics with the Court's request about whether there is a continuance or not." The trial court finally informed defendant: "It is clear . . . that this is merely a tactic for you, a tactic which is to delay this trial as long as possible. [¶] . . . [¶] . . . I do not find that your request is a true request to represent yourself, but rather is just a request to delay this trial based upon your prior conduct [and] your behavior in the court today as well."

## B. *Legal Principles and the Standard of Review*

In *Faretta, supra,* 422 U.S. 806, the United States Supreme Court recognized that "a defendant in a state criminal trial has a constitutional right to proceed without counsel" and "to conduct his own defense." (*Id.* at p. 807.) "A trial court must grant a defendant's request for self-representation if the defendant unequivocally asserts that right within a reasonable time prior to the commencement of trial, and makes his request voluntarily, knowingly, and intelligently." (*People v. Lynch* (2010) 50 Cal.4th 693, 721 (*Lynch*), overruled on another point in *People v. McKinnon* (2011) 52 Cal.4th 610.) "However, the right of self-representation is not absolute." (*People v. Williams* (2013) 58 Cal.4th 197, 253.)

"The court may deny a request for self-representation that is . . . intended to delay or disrupt the proceedings." (*People v. Butler* (2009) 47 Cal.4th 814, 825.) The trial

13

court properly denies a *Faretta* motion if it is "made for the purpose of delay rather than in a sincere effort to secure self-representation." (*People v. Marshall* (1997) 15 Cal.4th 1, 27.)

"[A] self-representation motion may be denied if untimely." (*Lynch, supra,* 50 Cal.4th at p. 722.) The purpose of requiring a timely *Faretta* motion "is 'to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.' " (*Ibid.*) Given this purpose, "timeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made." (*Id.* at p. 724.) "Thus, a trial court properly considers not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (*Id.* at p. 726.)

We review the trial court's denial of defendant's *Faretta* motion for abuse of discretion. (*People v. Welch* (1999) 20 Cal.4th 701, 735; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 959, 963.)

## C. *The Trial Court Did Not Err in Denying Defendant's Motion*

Here, it is undisputed that defendant's *Faretta* request was unequivocal and was made voluntarily, knowingly, and intelligently. The issue is whether the trial court erred in denying the motion as untimely and made for the purpose of delay.

Defendant contends that his *Faretta* motion was timely because it was made "well in advance of trial." Defendant's argument ignores the case law regarding the timeliness of *Faretta* motions. As the trial court noted, the totality of the circumstances must be considered when determining whether a *Faretta* motion is timely. (*Lynch, supra,* 50

14

Cal.4th at p. 724.) Based on the totality of the circumstances here, the trial court properly concluded that defendant's *Faretta* motion was untimely. Although defendant made his *Faretta* motion a month before motions in limine were scheduled to be heard, other factors showed that defendant's motion was untimely. As the trial court explained, defendant had plenty of opportunities to request self-representation during the 14 months in which he was represented by defense counsel, defense counsel was ready to proceed to trial, defense counsel was providing high quality representation, the case involved complex legal issues, the trial would likely be long and involve many witnesses, there were potential problems with the reluctance and availability of witnesses due to the age of the case and some witnesses' involvement in the witness relocation program, and defendant failed to meet deadlines and requested continuance of the trial during his previous grant of self-representation. Given the foregoing circumstances, the trial court reasonably concluded that granting self-representation would unjustifiably delay the trial. The trial court did not abuse its discretion in denying defendant's *Faretta* motion as untimely. (See generally *id.* at p. 723 [our Supreme Court has "deemed *untimely* a self-representation motion made about a month before trial"].)

Nor did the trial court err in concluding that defendant's motion was made for the purpose of delay. During the previous grant of self-representation, defendant requested continuance of the trial despite his assurance that he would not request continuances, and he failed to meet deadlines for witness lists, discovery, jury instructions, and trial briefs. The trial court explained that defendant engaged in a pattern of "[d]elays, delays, delays" during the previous grant of self-representation. In light of defendant's conduct during the previous grant of self-representation, it was not unreasonable for the trial court to conclude that the instant *Faretta* motion was made for the purpose of delay. Indeed, although defendant informed the trial court that he would not seek a continuance if he were again granted self-representation, the trial court found defendant's assertion to be

15

not "credible in the slightest." The trial court emphasized that defendant's "words in court today," his "body language," and his "delays and pregnant pauses in responding to simple questions" showed that defendant was engaging in a delay tactic and not making a "true request" for self-representation. (See *People v. Pride* (1992) 3 Cal.4th 195, 260 [a reviewing court defers to the trial court's observations and credibility determinations].) Given these circumstances, the trial court did not abuse its discretion in ruling that defendant's *Faretta* motion was made for the purpose of delay.

In sum, the trial court did not abuse its discretion in denying defendant's *Faretta* motion. Contrary to defendant's argument, the denial of the *Faretta* motion is not a basis for reversal.

## II. *Ineffective Assistance of Counsel*

Defendant contends that defense counsel rendered ineffective assistance in failing to object to testimony regarding defendant's gang membership and gang tattoo. Defendant also contends that defense counsel rendered ineffective assistance in failing to cross-examine witnesses 188 and 194 regarding a recorded jail conversation. As explained below, defendant has failed to establish ineffective assistance of counsel.

### A. *General Legal Principles*

The defendant bears the burden of proving ineffective assistance of counsel. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*).) "To prevail on an ineffective assistance of counsel claim, appellant must prove two elements: (1) trial counsel's deficient performance and (2) prejudice as a result of that performance." (*People v. Martinez* (2014) 226 Cal.App.4th 1169, 1189, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

Deficient performance is established "if the record demonstrates that counsel's performance fell below an objective standard of reasonableness under the prevailing norms of practice." (*In re Alvernaz* (1992) 2 Cal.4th 924, 937.) "A reviewing court will

16

indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*Carter, supra,* 30 Cal.4th at p. 1211; see also *People v. Witcraft* (2011) 201 Cal.App.4th 659, 664.)

Prejudice is established if "there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 (*Cunningham*).) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694.)

A defendant who raises the issue on appeal must establish ineffective assistance "based upon the four corners of the record." (*Cunningham, supra,* 25 Cal.4th at 1003.) Where the record on appeal "does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "In order to prevail on such a claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission." (*People v. Ray* (1996) 13 Cal.4th 313, 349.) "A factual basis, not speculation, must be established before reversal of a judgment may be had on grounds of ineffective assistance of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 933 (*Williams*).)

**B.** ***Background:  Testimony Regarding Defendant's Gang Membership and Gang Tattoo***

During motions in limine, the defense moved to exclude evidence of defendant's gang involvement and evidence of defendant's association with gang members.  The prosecutor argued such evidence was relevant to "witnesses' fear of retaliation" and was relevant to explain why witnesses "kept quiet for as long as they did."

The trial court ruled upon the defense motion as follows: "I am going to at this time tentatively prohibit the DA or their witnesses from indicating that the defendant is a Norteno gang member without a further showing of a basis for that. I am not prohibiting the People to present any relevant evidence as to the associations of the defendant and Norteno gang members . . . . [¶] . . . I'm not foreclosing the defense from objecting to any specific questions. I am prohibiting the People from referring to any tattoos of the defendant without further asking to approach the bench outside the jury with a showing of relevance."

During direct examination, witness 442 testified that defendant was an "active" member of Soledad Vatos Locos (SVL), a Norteno street gang. After witness 442 testified that he himself was involved in SVL, the prosecutor asked witness 442 whether he was "more heavily involved in the gangs" than defendant. Witness 442 testified in response to the prosecutor's question: "Probably about the same as [defendant]. But I just always used to get myself in a lot of trouble, like, just being stupid, you know." Witness 442 later testified that defendant had a tattoo of a huelga bird, which is a symbol of the Norteno gang. Defense counsel did not object to witness 442's testimony regarding defendant's gang membership and gang tattoo.

Witness 191 testified that defendant was "intimidating." The prosecutor then asked witness 191, "Well, the fact that you were both associating with a Norteno gang or members of the Norteno gang, would that be an intimidating factor?" Witness 191 responded, "No." The prosecutor also asked, "Was there an expectation that you would help [defendant] because you were both associates of a Norteno gang?" Witness 191 responded, "No." Defense counsel did not object to this line of questioning.

The prosecutor asked witness 253, "Did [defendant] have a reputation about being in a gang?" Witness 253 responded that defendant "ran with people from Soledad." Witness 253 explained that "Soledad" was the SVL gang. Witness 253 also testified that

18

the "friends and associates" of her boyfriend, witness 191, "were all gang members." Defense counsel did not object to witness 253's testimony regarding gangs affiliations.

**C.** *Analysis: Counsel Did Not Render Ineffective Assistance in Failing to Object to the Testimony Regarding Defendant's Gang Membership and Gang Tattoo*

Defendant contends that defense counsel rendered ineffective assistance in failing to object to the above-described testimony of witnesses 442, 191, and 253. Defendant contends that the testimony, which showed that he was a gang member with a gang tattoo, was irrelevant and inadmissible. Because defense counsel could have reasonably concluded that such evidence was relevant to witness credibility and thus admissible, defendant has failed to establish deficient performance.

"[T]he decision to object or not object to the admission of evidence is inherently tactical, and a failure to object will seldom establish ineffective assistance." (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092.) "Counsel's failure to make a futile or unmeritorious objection is not deficient performance." (*Ibid.*) "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387 (*Price*).)

"Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible." (*People v. Burgener* (2003) 29 Cal.4th 833, 869 (*Burgener*).) "An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court." (*Ibid.*) "It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible." (*People v. Gutierrez* (1994) 23 Cal.App.4th 1576, 1588.)

19

Here, the trial court ruled in limine that the prosecution could "present any relevant evidence as to the associations of the defendant and Norteno gang members." The trial court "tentatively prohibit[ed] the DA or their witnesses from indicating that defendant is a Norteno gang member without a further showing of a basis for that." The trial court ruled that evidence of defendant's tattoos could be admitted upon "a showing of relevance" at a bench conference. Thus, pursuant to the trial court's ruling, the prosecutor could present evidence of defendant's gang membership and gang tattoo if such evidence became admissible as relevant.

Defense counsel could have reasonably concluded that the testimony of witnesses 442, 191, and 253 regarding defendant's gang membership and gang tattoo was relevant to the issue of witness credibility. As described below, there was evidence that witnesses were afraid to testify and cooperate with police, and defense counsel could have rationally concluded that evidence regarding defendant's gang membership and gang tattoo was relevant to establish the basis of the witnesses' fear.

Witness 442 testified that he believed his life was in danger due to his testimony against defendant. Witness 442 explained that his testimony constituted "snitching." Witness 194 testified that he was "scared" to give his testimony against defendant. Witness 194 explained that "if you're a snitch" then "[y]ou're pretty much dead." Witness 194 also testified that he originally lied to the police about witnessing the charged crimes because he feared he would be killed if he told police what he had witnessed. Witness 194 believed that defendant or "someone associated with [defendant]" would "come after" him if he told the police the truth. Witness 188 testified that he did not want to testify against defendant. Witness 188 explained that he had previously associated with SVL, and he feared that he and his family would be "hurt" as a result of his testimony against defendant. Witness 188 further testified that he was at risk for "gang retaliation" because he was testifying against "someone who associates

20

with gang members." Witness 253 testified that she was "scared" to testify because she had heard "bad stories" about people who had given testimony.

Given the evidence of witness fear of retaliation, defense counsel could have rationally concluded that evidence regarding defendant's gang membership and gang tattoo explained the basis of the witnesses' fear. Evidence regarding the basis of witness fear is relevant to the issue of witness credibility and is thus admissible. (*Burgener, supra,* 29 Cal.4th at p. 869.) Defense counsel therefore could have reasonably concluded that it was futile to object to evidence of defendant's gang membership and gang tattoo. On the record before us, we cannot conclude that defense counsel's failure to object constituted deficient performance. (See *Price, supra,* 1 Cal.4th at p. 387 [counsel does not render ineffective assistance by failing to make objections that counsel reasonably determines would be futile].)

### D. *Background: Recorded Jail Conversation*

During trial, the prosecutor informed defense counsel of the existence of a surveillance video recording that showed witnesses 188 and 194 speaking to each other in jail on May 11, 2006. The entire recording was three to four hours long, and the recording was captured by a surveillance camera that was not designed to record conversations. Defense counsel described the audio portion of the recording as "very difficult to discern." The trial court commented that the audio portion of the recording was "fragmentary." After reviewing the recording and a transcript of the recording, defense counsel informed the trial court that he would not use the recording to cross-examine witnesses 188 and 194. Defense counsel explained: "What [the recording] does not have, in my opinion, are any complete conversations which would allow me to conduct any effective cross-examination at this point of those witnesses. [¶] . . . I don't believe that what I have allows me to effectively do that as a tactical matter."

21

**E.** *Analysis:  Counsel Did Not Render Ineffective Assistance in Failing to Cross-Examine Witnesses 188 and 194 Regarding the Recorded Jail Conversation*

Defendant contends that defense counsel rendered ineffective assistance in failing to cross-examine witnesses 188 and 194 regarding the recorded jail conversation. Specifically, defendant asserts that there "could be no plausible tactical reason for defense counsel choosing not to cross examine [witnesses 188 and 194] with proof of a lengthy jail discussion" where the "defense's theory was that 188 and 194 collaborated to provide the same story in order to avoid being prosecuted."  Defendant emphasizes that the "very existence" of the recording would have "impeached 188 and 194's testimony minimizing their contact."  As explained below, defendant has failed to establish deficient performance.

"[N]ormally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make." (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.)   The manner of cross-examination is a matter "within counsel's discretion" and "rarely" implicates ineffective assistance of counsel.  (*People v. McDermott* (2002) 28 Cal.4th 946, 993.)

A reviewing court is "rarely able to determine in retrospect whether some different approach, tone, or further line of questions, might have been more effective in a witness's cross-examination." (*Harris v. Superior Court* (2014) 225 Cal.App.4th 1129, 1143.)  "It is the attorney, not the court, that is in possession of the knowledge and understanding of the intricacies of his or her client's case, and is in the best position to discover and exploit any weaknesses in the prosecution's case." (*Ibid.*)  Thus, a reviewing court will "rarely second-guess counsel's cross-examination tactics." (*People v. Ervin* (2000) 22 Cal.4th 48, 94.)

Here, we cannot conclude that defense counsel was deficient in declining to cross-examine witnesses 188 and 194 regarding the recorded jail conversation. Defense counsel reviewed the recording to determine whether it could be used to cross-examine witnesses 188 and 194, and he determined that the recording would not provide an "effective" means of cross-examination as "a tactical matter." Defense counsel's conclusion was reasonable. It is undisputed that the audio portion of the recording was "very difficult to discern," "fragmentary," and lacked "complete conversations." Given that the recording did not capture any intelligible conversation, defense counsel rationally concluded that the recording did not support the defense theory that witnesses 188 and 194 colluded to fabricate a story. Defense counsel therefore did not render ineffective assistance in failing to cross-examine witnesses 188 and 194 regarding the recorded jail conversation. (See generally *People v. Jones* (2003) 29 Cal.4th 1229, 1254 [a reviewing court will defer to counsel's reasonable tactical decisions].)

Defendant speculates when he argues that the "very existence" of the recording would have impeached the testimony of witnesses 188 and 194 and bolstered the defense theory. As explained above, the recording did not capture any comprehensible conversation between witnesses 188 and 194. It is thus speculation to assume that the recording would have impeached testimony that witnesses 188 and 194 never collaborated to fabricate a story. It is also speculation to assume that the recording would have impeached testimony that witnesses 188 and 194 had minimal contact. Given that the audio portion of the recording was fragmentary—and thus did not demonstrate whether witnesses 188 and 194 engaged in any sort of meaningful conversation—we cannot conclude that the recording discredited the testimony that witnesses 188 and 194 had minimal contact. Defendant's speculative argument does not establish ineffective assistance of counsel. (See *Williams, supra,* 44 Cal.3d at p. 933.)

23

### III. *Admission of Hearsay Statements*

Defendant contends that the trial court prejudicially erred in admitting hearsay statements made by Angel. Defendant asserts that the statements did not come within any exception to the hearsay rule. As explained below, defendant has failed to show reversible error.

#### A. *Background*

During direct examination, witness 442 testified that Angel said he and defendant "murdered and carjacked some guy for his stuff." Witness 442 also testified that Angel said witnesses 188 and 194 "pussied out," "got scared," and "didn't want to go through with . . . or participate in" the charged crimes. Defense counsel objected to the admission of those out-of-court statements, arguing that they were hearsay not falling within any exception to the hearsay rule. The trial court overruled the objection, finding that the statements were admissible under the coconspirator statement exception to the hearsay rule and the declaration against interest exception to the hearsay rule.

#### B. *Defendant Has Failed to Show Reversible Error*

We need not determine whether the trial court erred in admitting the out-of-court statements described above. Defendant cannot show that he was prejudiced by any error in the admission of those statements.

The erroneous admission of hearsay evidence is ordinarily reviewed under the prejudice standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1015.) Under the *Watson* standard, an error warrants reversal if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d at p. 836.) Defendant contends that the admission of the statements here violated his federal right to due process and should thus be reviewed under the "harmless

24

beyond a reasonable doubt" prejudice standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. Defendant cannot show prejudice under either standard.

The evidence against defendant was overwhelming. Witness 194 and witness 188 both witnessed the charged crimes, and their testimony showed that defendant kidnapped Olinger, stabbed Olinger, and rode away in Olinger's Honda. In the hours after Olinger was stabbed, defendant arrived at witness 191's home with Olinger's school identification card, Olinger's wallet, Olinger's camera, and Olinger's Honda, which had a bloody backseat. Witness 191 testified that he helped defendant burn a bloody T-shirt. Witness 253 testified that defendant and Angel gave Olinger's watch to witness 191 in the hours after the stabbing. There was evidence that defendant did not know Olinger, yet defendant's fingerprint was on the front passenger seatbelt of Olinger's Honda and defendant's palm print was on an exterior window of Olinger's Honda.

The challenged out-of-court statements merely reiterated evidence provided by other witnesses. Witness 194 testified that, immediately after the stabbing and in defendant's presence, Angel said, "We killed him." Witness 191 testified that defendant and Angel said they "took the guy's car." Witness 191 also testified that defendant and Angel told him "about the stabbing" and described how the stabbing took place at the beach. Witness 253 told police that she heard defendant and Angel "whispering that they had stabbed somebody," and she also told police that defendant said he "stabbed a white boy." Witness 194 and witness 188 both testified that they did not participate in the charged crimes, and witness 194 testified that defendant called them "pussies" after they refused to participate.

On this record, we cannot conclude that defendant was prejudiced by any error in the admission of the challenged out-of-court statements. The admission of those statements therefore is not grounds for reversal.

25

**IV.** *Instruction Regarding Accomplice Testimony*

Defendant contends that the trial court erred in failing to sua sponte instruct with CALCRIM No. 335, which would have informed the jury that witnesses 188 and 194 were accomplices as a matter of law whose testimony required corroboration and should be viewed with caution. Defendant asserts that the trial court erred because the evidence "clearly established that 188 and 194 were accomplices as a matter of law." His theory of accomplice liability is as follows: witnesses 188 and 194 joined with defendant in "a conspiracy to commit assault and robbery," there was a felony murder "[w]hen the robbery turned to murder," and witnesses 188 and 194 were thus "facing the same charges as [defendant] based on a felony murder theory." As explained below, defendant's argument is unpersuasive.

**A.** *Background*

During discussions regarding jury instructions, defense counsel confirmed that witnesses 188 and 194 were not accomplices as a matter of law and that CALCRIM No. 335 was not a necessary instruction. The prosecutor and defense counsel agreed that the jury should be instructed pursuant to CALCRIM No. 334. CALCRIM No. 334 informed the jury that it must determine whether witnesses 188 and 194 were accomplices to the charged crimes, that if witnesses 188 and 194 were accomplices their testimony required corroboration, and that if witnesses 188 and 194 were accomplices their testimony should be viewed with caution.

**B.** *Legal Principles and the Standard of Review*

Penal Code section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical

26

offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen. Code, § 1111.)

"Whether a person is an accomplice within the meaning of section 1111 presents a factual question for the jury 'unless the evidence permits only a single inference.' [Citation.] Thus, a court can decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are 'clear and undisputed.' [Citations]." (*People v. Williams* (1997) 16 Cal.4th 635, 679.)

"[A]n accomplice is one who aids or promotes the perpetrator's crime with knowledge of the perpetrator's unlawful purpose and an intent to assist in the commission of the target crime." (*People v. Williams* (2008) 43 Cal.4th 584, 637, italics omitted.) For an accomplice to be liable for murder under a felony murder theory, the accomplice "at a minimum" must "have been, at the time of the killing, a conspirator or aider and abettor in the [target] felony." (*People v. Pulido* (1997) 15 Cal.4th 713, 723.)

Trial courts have a sua sponte duty to instruct on the general principles of law relevant to and governing the case. (*People v. Rubalcava* (2000) 23 Cal.4th 322, 333-334.) "When there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices." (*People v. Frye* (1998) 18 Cal.4th 894, 965-966, disapproved of on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 422, fn. 22.)

"We review a claim of instructional error de novo." (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) "Whether or not the trial court should have given a 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominantly legal.' [Citation.] As such, it should be examined without deference." (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.)

### C. *The Trial Court Did Not Err*

Here, the evidence did not establish that witnesses 188 and 194 were accomplices as a matter of law. Contrary to defendant's assertion, the evidence did not conclusively demonstrate that witnesses 188 and 194 joined defendant in a conspiracy to commit assault and robbery. It is true that witness 194 testified that, before the charged crimes occurred, "there was some discussion about finding someone to beat up." It also true that witness 194 testified that, during the car ride on the night of the charged crimes, there was "[p]robably" a conversation about committing a robbery. The evidence did not decidedly show, however, that witnesses 188 and 194 intended to conspire and intended to commit assault and robbery: witness 188 testified that the purpose of the car ride was to look for girls, witness 188 explained that no "other purpose" was discussed, witness 188 denied that there was any "discussion in the car about robbing somebody or jacking somebody," witness 188 denied that there was a plan to look for someone to rob, witness 188 testified that his "intention was never to be a get-away" driver, witness 194 denied that he was "looking for somebody to rob" on the night of the charged crimes, and witness 194 testified that he had "nothing to say" and had "no say-so" in any conversation regarding a potential crime. Thus, clear and undisputed facts did not show that witnesses 188 and 194 joined defendant in a conspiracy to commit assault and robbery. (See *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1707 [the offense of conspiracy requires "the intent to conspire" and "the specific intent to commit the planned offense"].) Defendant's felony murder theory of accomplice liability therefore fails, and he has not shown that the trial court had a sua sponte duty to instruct that witnesses 188 and 194 were accomplices as a matter of law. We accordingly do not find instructional error.

28

## V. *Denial of Continuance Motions*

Defendant contends that the trial court abused its discretion in denying two defense motions for continuances. Defendant asserts that the continuances were necessary to complete an analysis of the surveillance recording that captured witnesses 188 and 194 speaking in jail. He emphasizes that the recording had "potential importance" as impeachment evidence. As explained below, we find no abuse of discretion.

### A. *Background*

At the close of the prosecution's evidence on Thursday, September 26, 2013, defense counsel advised the trial court of the existence of the recorded jail conversation between witnesses 188 and 194. Defense counsel explained that the prosecutor first provided discovery regarding the recording "last weekend." As part of the discovery, the prosecutor provided a version of the audio that had been "enhanced"[3] by a local expert. Defense counsel explained that the enhancement had "improved" the quality of the recording. Defense counsel noted that, despite the enhancement, the audio was still "very difficult to discern." Defense counsel requested "to continue the case until Monday" in order to review the recording and a transcript of the recording. The trial court granted the continuance request.

On Monday, September 30, 2013, defense counsel informed the trial court that the recorded jail conversation was "fragmentary" and did not contain "any complete conversations." Defense counsel requested a one-week continuance to further analyze the recording. Defense counsel explained that he had obtained an expert in forensic audio, Dr. Durand Begault, who would review the recorded conversation and "provide the best enhancement possible." Defense counsel noted, however, that it was unclear

---

[3] The record does not contain any description of the so-called enhancement procedure.

whether Dr. Begault could improve the quality of the recording. Defense counsel explained: "That is not to say that [Dr. Begault] can improve on what has been supplied. We don't know to what degree what has been supplied has been enhanced." The prosecutor objected to the continuance, arguing that she and two investigators reviewed the recording and found "nothing exculpatory," defense counsel failed to show that Dr. Begault could "get more information from these tapes," and some jurors would become unavailable if the case were continued for a week. The trial court denied the continuance, explaining in part: "[T]he recordings have already been enhanced by a local expert revealing all that can be enhanced. There is no showing whatsoever that additional time would provide any additional information, nor is there any showing that there is potential exculpatory information."

At the sentencing hearing on October 30, 2013, the defense filed a motion seeking a one-week continuance that would allow Dr. Begault to fully analyze the recorded jail conversation. The motion asserted that Dr. Begault had conducted a "preliminary analysis" of the recording and discovered 20 minutes of missing audio. The motion posited that further analysis by Dr. Begault might bolster the "hypothesis that erasure was involved" and thus "support a motion for a new trial." During argument on the motion, defense counsel confirmed that the missing audio was not necessarily deleted, but could have resulted from "a number of things" including "mechanics, the way the system is set up, from deletions or other technical errors." The trial court denied the continuance motion, explaining: "[T]he defense request is based upon the hope, the desire that there may be exculpatory evidence. There's been no showing that there is exculpatory evidence, that there is likely to be exculpatory evidence, or any evidence to support the defense theory. It is merely speculation that such evidence may be there. [¶] Based upon that, the motion to continue sentencing is denied."

30

**B.** *Legal Principles*

"Continuances shall be granted only upon a showing of good cause." (Pen. Code, § 1050, subd. (e).) " 'A "trial court has broad discretion to determine whether good cause exists to grant a continuance of the trial." ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 296.) "The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked." (*People v. Beames* (2007) 40 Cal.4th 907, 920.)

"An important factor for a trial court to consider is whether a continuance would be useful." (*People v. Beeler* (1995) 9 Cal.4th 953, 1003 (*Beeler*), abrogated on another ground as stated in *People v. Pearson* (2013) 56 Cal.4th 393, 462.) "[T]o demonstrate the usefulness of a continuance a party must show both the materiality of the evidence necessitating the continuance and that such evidence could be obtained within a reasonable time." (*Ibid.*) A continuance "may properly be denied when the request is based on allegedly new evidence of speculative value." (*In re Ernesto H.* (2004) 125 Cal.App.4th 298, 316, citing *Beeler, supra,* 9 Cal.4th at p. 1004.)

**C.** *The Trial Court Did Not Abuse its Discretion*

The trial court did not abuse its discretion in denying the continuance motion made on September 30, 2013. The defense failed to show that a continuance would be useful. Although defense counsel asserted that the continuance was necessary for Dr. Begault to analyze and enhance the recorded conversation, there was no showing that Dr. Begault could actually improve the quality of the recording and uncover helpful evidence. Defense counsel even conceded that he was unable to state whether Dr. Begault's analysis would improve upon the enhancement that had already been conducted. Because there was no showing that a continuance would be useful to the defense, the trial court did not abuse its discretion in denying the continuance motion made on September 30, 2013.

31

Nor did the trial court abuse its discretion in denying the continuance motion made on October 30, 2013. Again, the defense failed to show that a continuance would be useful. Although the defense was able to show that 20 minutes of audio were missing from the recorded jail conversation, the defense was unable to show that further investigation would uncover evidence that would support a motion for a new trial. Defense counsel conceded that the missing audio was not necessarily deleted, and the defense made no showing suggesting that the missing audio had in fact been deleted. Indeed, defense counsel admitted that the missing audio could have been caused by "a number of things." The trial court thus properly concluded that the defense engaged in speculation when it asserted that further investigation by Dr. Begault could uncover evidence that would support a new trial motion. We cannot find an abuse of discretion in the denial of the continuance motion made on October 30, 2013.

Defendant also briefly argues that we should transfer jurisdiction to the trial court so that Dr. Begault can complete his analysis and a new trial motion can be filed. Defendant's argument is premised on the assumption that the trial court erred in denying the two continuance motions. Given our conclusion that the trial court did not err in denying the continuances, we decline defendant's request to transfer jurisdiction to the trial court.

## VI. *Cumulative Error*

Defendant finally contends that cumulative error warrants reversal. A claim of cumulative error "is in essence a due process claim." (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

Here, we are satisfied that defendant received due process and a fair trial. As explained above, defendant has failed to show any error that infringed his due process

32

rights.  Moreover, defendant "was entitled to a fair trial but not a perfect one." (*Cunningham, supra,* 25 Cal.4th at p. 1009.)  Defendant's trial was fair, and his claim of cumulative error fails.

## DISPOSITION

The judgment is affirmed.

_____

                                       RUSHING, P.J.


WE CONCUR:


_____

     ELIA, J.


_____

     WALSH, J.[*]


*People v. Ruelas*
**H040372**

---

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

34